# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**JAI ALQUAN KING,**

     Plaintiff,

v.                                      Civil Action No. **3:21CV352**

**A. BOYD, *et al.*,**

     Defendants.

## MEMORANDUM OPINION

Jai Alquan King, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action in which he alleges A. Boyd and Dr. Moreno denied him adequate medical care for an ankle injury, and Sergeant Beasley and Lieutenant Sample denied him grievance forms, during his confinement in the Riverside Regional Jail in violation of the Eighth Amendment.[1] The matter proceeds on King's Particularized Complaint. (ECF No. 37.) Specifically, King raises the following claims for relief:

> **Claim One:** Defendants Boyd and Moreno denied him adequate medical care when they "downplayed" his broken ankle for four months despite knowing he "needed immediate emergency medical care." (*Id.* at 1.)
>
> **Claim Two:** Defendants Beasley and Sample were deliberately indifferent when they "refused to give [King] a grievance" form on April 19, 2021, through April 23, 2021 "so [King] could address my immediate medical need." (*Id.* at 3.)

King requests monetary damages. (*Id.* at 4.) The matter is before the Court on King's Motion for Summary Judgment, (ECF No. 55), the Motion for Summary Judgment filed by Defendants Boyd and Moreno, (ECF No. 62), and the Motion for Summary Judgment filed by Defendants Beasley

---

[1]    The Court corrects the spelling of Defendant Beasley's name as reflected in his submissions. The Court employs the pagination assigned by the CM/ECF docketing system. The Court also corrects the spelling, capitalization, and punctuation in the quotations from the parties' submissions.

and Sample. (ECF No. 65.) King has filed responses. (ECF Nos. 68, 69.) Defendants filed replies. (ECF Nos. 70, 71.) Because King's claims lack merit, King's Motion for Summary Judgment will be DENIED, and the Motions for Summary Judgment filed by the Defendants will be GRANTED.

## I.    KING'S MOTION FOR SUMMARY JUDGMENT

As a preliminary matter, King filed a document that states, in sum: "I am filing a motion for summary judgment." (ECF No. 55.) This document is clearly insufficient to properly move for summary judgment. Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is the responsibility of the party seeking summary judgment to inform the court of the basis for the motion and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, per this Court's Local Rules, a motion for summary judgment shall state with particularity the grounds upon which it is based and shall be accompanied by a written brief setting forth a concise statement of the facts and supporting reasons, along with a citation of the authorities upon which the movant relies. E.D. Va. Loc. Civ. R. 7(A), (F); E.D. Va. Loc. Civ. R. 56(B).

King's Motion for Summary Judgment does none of the above. Accordingly, King's Motion for Summary Judgment, (ECF No. 55), is DENIED.

## II.    STANDARD FOR SUMMARY JUDGMENT

In addition to the standards for summary judgment identified above for the moving party, "where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers

2

to interrogatories, and admissions on file." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials.").

In support of their Motion for Summary Judgment, Defendants Boyd and Moreno submit: the declaration of Defendant Dr. Dale Moreno, (ECF No. 63–1), who attests that the hundreds of pages of medical records attached, (ECF Nos. 63–2, 63–3), are true and correct; the declaration of Defendant Amanda Boyd, LPN, (ECF No. 63–4); and the declaration of Lt. Charlene R. Jones, (ECF No. 63–5).

In support of their Motion for Summary Judgment, Defendants Beasley and Sample submit: the declaration of Defendant Capt. Nicholas Sample, (ECF No. 66–1); the declaration of Defendant Lt. Montrell Beasley (ECF No. 66–2); and the declaration of Lt. Charlene R. Jones, (ECF No. 66–3). Defendants Beasley and Sample also submit a Supplemental Declaration of Lt. Charlene R. Jones in response to King's unsworn responses that "clarif[ies] and elaborate[s] upon the grievance procedure described in Paragraph 4 of her May 3, 2023 Declaration." (ECF No. 71–1.)

At this stage, the Court is tasked with assessing whether King "has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. Although King filed responses to the Motions for Summary Judgment, none are sworn to under penalty of perjury, and therefore, fail to constitute admissible evidence.[2] King also submitted an unsworn Particularized Complaint. *See United*

---

[2] King was warned three times during the pendency of this action of the manner he must respond to the Motions for Summary Judgment. First, in the Court's December 13, 2022 Memorandum Order serving the action on Defendants, the Court explained:

> Plaintiff is advised that the Court will not consider as evidence in opposition to any motion for summary judgment a memorandum of law and facts that is sworn to under penalty of perjury. Rather, any verified allegations must be set forth in a separate document titled "Affidavit" or "Sworn Statement," and reflect that the sworn statements of fact are made on personal knowledge and that the affiant is competent to testify on the matter stated therein. *See* Fed. R. Civ. P. 56(c)(4).

(ECF No. 39, at 2.) Subsequently, accompanying the defendants' Motions for Summary Judgment were notices pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), that once again reminded King of his obligations. (ECF Nos. 64, 65, at 1–2.) Finally, Defendants Boyd and Moreno filed a Reply to King's response to the Motion for Summary Judgment, and specifically pointed out to King that he had failed to comply with Fed. R. Civ. P. 56(c)(4), the Court's local rules, and the Court's prior order. (ECF No. 70, at 1–3.) Although King responded to that Reply, he failed to submit any affidavit or any other evidence in support of his claims.

4

*States v. White*, 366 F.3d 291, 300 (4th Cir. 2004). King's failure to present any evidence to counter the defendants' Motions for Summary Judgment permits the Court to rely solely on the defendants' submissions in deciding the Motion for Summary Judgment. *See Forsyth*, 19 F.3d at 1537; Fed. R. Civ. P. 56(c)(3) ("The Court need only consider the cited materials.").

In light of the foregoing submissions and principles, the following facts are established for the Motion for Summary Judgment. All permissible inferences are drawn in favor of King.

## III. UNDISPUTED FACTS

As a preliminary matter, the Court notes that the medical record in this action is lengthy. Despite King's apparent dissatisfaction with the prescribed treatment, however, the record reflects that King received a great deal of medical care for his ankle injury between April 18, 2021, and September 2022, long after he filed this action.

### A. Facts Related to Medical Care

King has been an inmate at the Riverside Regional Jail since approximately January 22, 2020. (ECF No. 63–5 ¶ 6.)[3] King suffered a left ankle injury while playing basketball on April 18, 2021. (ECF No. 63–1 ¶ 9.) That same day, King saw Nurse Schlindwein for a nurse sick call where King reported a left ankle injury. (*Id.* ¶ 5.) Nurse Schlindwein noted that King "had a left ankle deformity and his foot pointed to the right with the ankle swelling 2+." (*Id.*) Nurse Schlindwein informed Dr. Moreno of her findings, and Dr. Moreno "ordered a stat x-ray and ordered the patient to non-weight bearing status." (*Id.*) King's left ankle was x-rayed and wrapped in an ace bandage, and King was provided with crutches and instructions not to bear weight on his left foot. (*Id.*) King was also provided with a bottom bunk and bottom tier pass. (*Id.* ¶ 9.) Dr. Moreno explains that "[t]he x-rays of the left ankle showed a fracture involving the left distal fibula

---

[3] The Court omits the secondary citations to the medical records in its summary of the undisputed facts.

with mild displacement," but that the "joint alignment was maintained and there was associated soft tissue swelling." (*Id.* ¶ 5.) Dr. Moreno prescribed King acetaminophen 325 mg tabs and ibuprofen 200 mg tabs to take twice per day for thirty days. (*Id.*) King was administered ibuprofen daily from April 18 until May 2, 2021. (*Id.*)

On April 21, 2021, King saw Nurse Schlindwein for a nurse sick call appointment. (*Id.* ¶ 6.) Dr. Moreno also examined King at that time and "noted the swelling to the left foot." (*Id.*) Dr. Moreno advised King "to keep the ankle immobilized and elevated and ice as much as possible for 20 minutes every hour." (*Id.*) Dr. Moreno noted that the "swelling was in normal limits for post fracture" and that King "had good pedal pulses and had no warmth or redness . . . [in] the swollen foot." (*Id.*)

Dr. Moreno explains that he

was aware that [King] had a fracture involving the left distal fibula with mild displacement. However, there was no reason to send him to the hospital emergently for the fracture. Emergency surgery for a fractured ankle is rarely indicated. Surgery would be required if the bone is severely dislocated, part of it had broken off or through the skin, or the ankle was unstable. [King's] fracture, even though it was mildly displaced, did not require emergency surgery and if he has been sent to the hospital immediately, he would have been sent back to RRJ without any surgery taking place. Typically, an ankle fracture requires non-weightbearing and compression (through an ace wrap or casting) and the fracture heals on its own through a process called remodeling. This is what I initially prescribed for [King].

(*Id.* ¶ 7.)

On May 2, 2021, Dr. Moreno again prescribed King ibuprofen 200 mg tabs to take twice a day. (*Id.* ¶ 8.) King was administered four tabs of ibuprofen once on May 3 and twice on May 4 through 6. (*Id.*) On May 6, 2021, Dr. Moreno saw King for a follow up appointment. (*Id.* ¶ 9.) King arrived at the appointment on crutches, and he appeared comfortable and in no acute distress. (*Id.*) King told Dr. Moreno that that pain had "improved a little overall, but it was too painful that day to bear weight and walk," and that "Motrin and Tylenol were not very effective for the pain."

(*Id.*) Upon examination, Dr. Moreno noted that there was still some bruising of the left foot and some swelling, but overall the swelling had decreased, the ankle was tender when palpitated, and his range of motion was somewhat limited secondary to pain. (*Id.*) Dr. Moreno prescribed King Cymbalta 30 mg caps for 7 days and then 60 mg caps for 180 days, and also Naproxen 500 mg tabs for thirty days. (*Id.*) Dr. Moreno continued King on crutches and told him not to bear weight on that foot. (*Id.*) Dr. Moreno discontinued Motrin, ordered King a walking boot, and submitted a consultation request for King to see an orthopedist. (*Id.*)

On June 9, 2021,[4] King saw Nurse Hill in the clinic for complaints of dry skin. (*Id.* ¶ 10.) King had no other issues or complaints, and he did not report any pain or discomfort until she examined him. (*Id.*) Nurse Hill ordered a repeat x-ray of King's left ankle. (*Id.*) The following day King had an x-ray of his left ankle. (*Id.* ¶ 11.) The radiologist "noted no acute fracture, dislocation or destructive bony process and no soft tissue abnormality," and "no acute osseous abnormality," but "noted chronic fibular tip fracture deformity and recommended consideration of an MRI as clinically warranted." (*Id.*)

On July 16, 2021, King saw an orthopedist at the Virginia Commonwealth University ("VCU") Foot/Ankle Clinic. (*Id.* ¶ 12.) The orthopedist "noted the diagnosis of a left distal fibular fracture with ankle instability" and that "X-ray results showed a distal fibular fracture, not fully healed yet." (*Id.*) The orthopedist "recommended a lace-up ankle brace, [a] left ankle MRI, [an] order for no running/jumping or impact activities, ankle rehabilitation exercises, and a follow-up in four weeks." (*Id.*) King was provided with a handout that showed him ankle exercises that he should do on his own. (*Id.*)

---

[4] On June 2, 2021, King filed the present civil suit. (ECF No. 1.)

Dr. Moreno also saw King on July 16, 2021, after he returned from his appointment at VCU. (*Id.* ¶ 13.) King had been provided with crutches and was non-weightbearing. (*Id.*) King "reported that the left ankle pain gradually improved to the point that he could bear weight on it" and that the orthopedist told him he "could bear weight as tolerated." (*Id.*) King reported "[t]he pain had improved so that he was able to walk without limping." (*Id.*) Dr. Moreno noted that King had localized mild swelling immediately above his left lateral ankle, his ankle was tender on palpitation, but there was no bruising. (*Id.*) Dr. Moreno reviewed the notes from the orthopedist; noted that the orthopedist had provided King with a lace-up ankle brace; requested a left ankle MRI as recommended; continued the order for no running, jumping, or impact exercises; and continued Naproxen 500 mg twice a day for pain. (*Id.*) Dr. Moreno submitted a consultation request for King to return to VCU Ortho in four weeks as recommended. (*Id.*)

On August 17, 2021, King had an MRI without contrast of his left ankle. (*Id.* ¶ 14.) The MRI showed a "[t]ransverse, minimally displaced fracture of the inferior lateral malleolus," low-grade sprains of ligaments without a tear, and tendonitis without a discrete tear. (*Id.*) It is unclear from the record when the orthopedist received and reviewed these results and conveyed any recommendation to medical staff at Riverside Regional Jail.[5] On August 20, 2021, Dr. Moreno renewed King's Cymbalta and Naproxen prescriptions. (*Id.* ¶ 15.) King received Naproxen when requested between August 21, 2021, and September 18, 2021. (*Id.*)

On September 30, 2021, Dr. Moreno wrote a consultation request for King for surgery at VCU Ortho. (*Id.*) Dr. Moreno noted: "After obtaining a recent MRI of the Left ankle, VCU Ortho is now recommending 'Surgical Fixation of Left ankle non healed distal fibula fracture.'" (ECF No. 63–2, at 51 (emphasis omitted).) Nurse Hill prescribed King Naproxen 500 mg tabs twice a

---

[5] The VCU Health record indicates that the MRI report was "Filed by: Interface, Radiology Results Conversion 10/28/21." (ECF No. 63–3, at 31.)

day for 30 days that same day. (ECF No. 63–1 ¶ 15.) King was administered Naproxen when requested between September 30 and October 29, 2021. (*Id.*)

On October 1, 2021, King had surgery that involved "ORIF (open reduction internal fixation)" on his left ankle. (*Id.* ¶¶ 16, 20.) After surgery, King returned to Riverside Regional Jail and saw Nurse Hill in the clinic, where she observed that he "was up on crutches without difficulty," and he denied any concerns. (*Id.* ¶ 16.) Dr. Moreno prescribed King Tylenol with Codeine for nine days post-surgery. (*Id.*) On October 15, 2021, King returned to VCU Ortho for a two-week post-surgery follow-up. (*Id.* ¶ 17.) The orthopedist noted "a healing fracture in appropriate alignment" and "recommended non-weightbearing, [a] cast, elevation, and [to] return in four weeks." (*Id.*)

On October 27, 2021, King saw Nurse Hill in the clinic. (*Id.* ¶ 18.) King had a cast on his left ankle and was using a wheelchair for non-weightbearing. (*Id.*) Nurse Hill "noted minimal swelling . . . and pain managed with Naproxen and Cymbalta" and that King "appeared very comfortable and in no acute distress." (*Id.*) Nurse Hill submitted a consultation request for King's follow-up appointment at VCU. (*Id.*)

On November 19, 2021, King saw Nurse Stacy after returning from his offsite appointment with VCU Ortho. (*Id.* ¶ 19.) Nurse Stacy noted that King had his cast removed and he had been issued a walking boot and was weightbearing. (*Id.*) King also had a brace to wear at night and a cream to help with dry skin on his legs. (*Id.*)

On February 18, 2022, King saw the orthopedist at VCU Ortho for a follow-up. (*Id.* ¶ 20.) The orthopedist "noted a healing fracture with mild medial discomfort" and recommended "(1) formal physical therapy for left ankle/foot conditioning; (2) bilateral shoe insoles; (3) running shoes/sneakers; (4) no running or jumping activities; (5) an ankle brace as needed; and (6) return

in three months." (*Id.*) The orthopedist "submitted a referral for [King] to have physical therapy one to two visits per week for eight weeks," because King needed "a left ankle conditioning program" and "flat foot exercises." (*Id.*)

On February 22, 2022, King saw Nurse Hill in the clinic, and she noted that his ankle was healing and the recommendation for physical therapy. (*Id.* ¶ 21.) Nurse Hill submitted a consultation request for King's follow-up at VCU Ortho in three months. (*Id.* ¶¶ 20, 21.)

On May 20, 2022, King returned to VCU Ortho for his follow-up appointment. (*Id.* ¶ 22.) King reported "mild lateral and medial ankle pain" and "an x-ray showed a healing fracture with implant in place." (*Id.*) The orthopedist "recommended: (1) physical therapy for 8-12 weeks; (2) good stable running shoes; (3) gradual return to activities; and (4) return in four months." (*Id.*) King saw Nurse Hill in the clinic after his appointment and submitted a request for King's next follow-up appointment at VCU Ortho. (*Id.*)

On June 28, 2022, King saw Nurse Hill for a sick call visit. (*Id.* ¶ 23.) King "request[ed] his shoes out of property," and "[h]e reported no issues or concerns and stated he had been walking well." (*Id.*) Nurse Hill examined King and he was walking with a normal gait. (*Id.*) Nurse Hill released his shoes out of property and submitted a consultation request to VCU for physical therapy. (*Id.*)

On July 25, 2022, King had a physical therapy appointment which was apparently his second appointment. (*Id.* ¶ 24; ECF No. 63–3, at 127.)[6] On September 16, 2022, King returned

---

[6] It is unclear why King only had a few appointments for physical therapy. In his unsworn response, King indicates that he went to physical therapy three times even though the orthopedist recommended a series of 8 to 12 weeks. (ECF No. 68, at 3.) King, however, did not raise a claim related to his access to physical therapy in his Particularized Complaint. To the extent that he intends to add such a claim in his response, he may not do so. "[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss. To hold otherwise would mean that a party could unilaterally amend a complaint at will, even without filing an amendment,

to VCU Ortho for a follow-up. (*Id.* ¶ 25.) The orthopedist "noted that the x-rays now showed a healed fracture" and "recommended activity and weightbearing as tolerated and [for King to] return as needed." (*Id.*)

### B.    Nurse Boyd's Role in the Medical Department

Nurse Boyd, one of the defendants, is a Licensed Practical Nurse and has served as the Health Services Administrator at the Riverside Regional Jail since September 12, 2020. (ECF No. 63–4 ¶ 2.) In her role, Nurse Boyd manages administrative matters in the medical department and responds to inmate grievances about medical care. (*Id.*) Nurse Boyd was not involved in King's medical treatment, had no role in deciding the course of his treatment, and avers that "[d]ecisions regarding an inmate's medical treatment are made by higher-level providers, such as physicians or nurse practitioners." (*Id.*) Although King claims that Nurse Boyd saw the x-ray results, knew his ankle was broken and that he needed emergency care, and refused to send him to hospital and left him in pain for four months, this is untrue. Nurse Boyd explains that, "[a]s an LPN, [she is] not trained to review or interpret x-rays and [she] did not review Mr. King's x-rays on April 18, 2021 as he alleges." (*Id.* ¶¶ 4–5.) Nurse Boyd "was not involved in determining the course of medical treatment for [King's] broken ankle." (*Id.* ¶ 5.)

### C.    Facts Pertaining to Grievances

The grievance procedure at Riverside Regional Jail begins with the filing of an informal complaint that the inmate must complete and turn in to any staff member who will forward the completed form to the Housing Unit Supervisor. (ECF No. 71–1 ¶¶ 5–6.) Once the Housing Unit Supervisor makes a decision on the informal complaint, and the decision is approved by the Housing Unit Manager, the inmate may accept the decision or file a grievance. (ECF No. 63–5

---

and simply by raising a point in a brief." *Morgan Distrib. Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989) (internal citations omitted) (internal quotation marks omitted).

¶ 4.) The inmate can appeal the outcome of a grievance, and if he or she is not satisfied with the outcome of the appeal, the inmate may obtain a section 1983 form and file a complaint. (*Id.*)

All documents pertaining to the above process and medical requests are obtained in an electronic system called "OMS." (ECF No. 71–1 ¶¶ 7–8.) A review of OMS shows that there is no record of King ever filing a grievance during his most recent detention in the Riverside Regional Jail. (ECF No. 63–5 ¶ 9; ECF No. 71–1 ¶ 9.)[7]

Capt. Sample served as a Lieutenant at Riverside Regional Jail from February 2021 until February 2023, and from February 2021 until May 2021, he was the Housing Unit Manager for Housing Unit 3. (ECF No. 66–1 ¶¶ 3–4.) King "was housed in Housing Unit 3 from January 21, 2021, until June 21, 2021, at which time he was placed in restrictive housing for fighting. He has not returned to Housing Unit 3 since that time." (*Id.* ¶ 5.) Capt. Sample explains that "[w]hile serving as the Housing Unit Manager for Housing Unit 3, any decisions . . . made by Lt. Beasley (who was a Sergeant at the time and served as Housing Unit 3 Supervisor) pursuant to an informal complaint would have required my approval." (*Id.* ¶ 7.) Capt. Sample avers that King "never submitted an informal complaint and never filed a grievance regarding the provision of medical services for his alleged ankle injury," and he "never made any complaints to me, formally or informally, that he was receiving inadequate medical care for any alleged ankle injury." (*Id.* ¶¶ 8– 9.)

> Capt. Sample
>
> never refused to provide the proper grievance-related forms to King, as he alleged in his Complaint. While I cannot recall whether King asked me for a grievance-related form on 4-22-2-2021 or 4-23-2021, specifically, I do nevertheless recall a couple of occasions when King did request an informal complaint form—i.e. the form to complete the first step of the grievance procedure—and I provided him with

---

[7] Nurse Boyd also affirmed that "there is no record of Mr. King filing any grievances while at" Riverside Regional Jail. (ECF No. 63–4 ¶ 3.)

that form on each occasion. However, he never completed or turned in any of those complaints to my knowledge.

(*Id.* ¶ 10.) Capt. Sample was not involved in the provision of medical care to inmates and "never hindered King from accessing medical care." (*Id.* ¶ 12.)

Lt. Beasley served as a sergeant at Riverside Regional Jail from 2020 to 2022, and during that time he was the Housing Unit 3 Supervisor. (ECF No. 66–2 ¶ 3.) While serving as Housing Unit 3 Supervisor, any decisions Lt. Beasley made about an informal complaint would have required the approval of Capt. Sample. (*Id.* ¶ 6.) Lt. Beasley avers that "King did not ask me to provide him with any grievance-related forms on 4-19-2021, 4-20-2021, or 4-21-2021 as he alleges in his Complaint." (*Id.* ¶ 7.) In fact, Lt. Beasley was not on duty on April 21, 2021. (ECF No. 71–1 ¶ 11.) Lt. Beasley explains that if King had asked him for these forms, he "would have provided [King] with an informal complaint to complete, as that would have been the first step. Filing an informal complaint is a prerequisite to obtaining the form to file an official grievance." (ECF No. 66–2 ¶ 7.) Lt. Beasley explains that he "never refused to provide the proper grievance-related forms to King when requested," and that King, "never submitted an informal complaint to [him] regarding his alleged ankle injury, and as such never filed a formal grievance regarding the same." (*Id.* ¶¶ 8–9.)

Lt. Beasley recalls that the only personal interaction he had with "King was sometime after April 2021, when King told me he was going to sue the jail because of his alleged ankle problems." (*Id.* ¶ 10.) Before that, King never made Lt. Beasley aware of any problems related to his ankle injury, and King "never made any complaints to me, formally or informally, that he was receiving inadequate medical care for any alleged ankle injury." (*Id.* ¶¶ 10–11.) Lt. Beasley was not involved in the provision of medical care to inmates and never hindered King from receiving medical care. (*Id.* ¶¶ 12–13.)

Lt. Beasley and Capt. Sample "were not King's only avenue for obtaining and turning in grievance-related forms." (ECF No. 71–1 ¶ 12.) King could have requested these forms from and turned the forms into individuals other than Lt. Beasley or Capt. Sample. (*Id.*)

### III. ANALYSIS

**A.    Fourteenth Amendment Principles**

From King's submissions, it is unclear whether he was a convicted felon at the time of his complaints or a pretrial detainee. King alleges that the defendants' actions violated the Eighth Amendment, and the defendants also address his claims as one brought under the Eighth Amendment. Because King was housed in the Riverside Regional Jail East at the time of his complaints, however, it is likely that King was a pretrial detainee, and therefore, the Court analyzes his claim under the Fourteenth Amendment. *Moss v. Harwood*, 19 F.4th 614, 624 (4th Cir. 2021) (citing *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988)); *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021).[8]

"The due process rights of a pretrial detainee are at least as great as the eighth amendment protections available to the convicted prisoner." *Martin*, 849 F.2d at 870. Therefore, "a pretrial detainee [demonstrates] a violation [of the Fourteenth Amendment] at least where 'he shows deliberate indifference to serious medical needs' under cases interpreting the Eighth Amendment." *Mays*, 992 F.3d at 300 (quoting *Martin*, 849 F.2d at 870).

To survive summary judgment, an inmate must demonstrate (1) that objectively the deprivation suffered or harm inflicted "was 'sufficiently serious,' and (2) that subjectively the

---

[8] The defendants are warned that, in the future, they must address the nuances of these principles or else the Court may summarily dismiss any dispositive motion. But because the analysis is similar for claims of denial of adequate medical care whether under the Eighth or Fourteenth Amendment, *see Moss*, 19 F.4th at 624 (4th Cir. 2021) (citation omitted); *Mays*, 992 F.3d at 300, the Court proceeds to the merits.

prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). With respect to the denial of adequate medical care, "a prisoner must [demonstrate] acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The subjective prong requires the plaintiff to demonstrate that a particular defendant acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (stating same). Thus, to survive a motion for summary judgment, the deliberate indifference standard requires a plaintiff to demonstrate that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate

in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich*, 129 F.3d at 340 n.2).

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). Furthermore, in evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

## B.    Medical Care Claim (Claim One)

In Claim One, King contends that Defendants Boyd and Moreno denied him adequate medical care when they "downplayed" his broken ankle for four months despite knowing he "needed immediate emergency medical care." (ECF No. 37, at 1.) King argues that Nurse Boyd and Dr. Moreno "saw my x-ray 4-18-21 the same day knowing that my ankle was indeed broken and that I needed immediate emergency medical care that they could not provide but a hospital could." (*Id.*) First, with respect to any allegation against Nurse Boyd, she is not trained to read or interpret x-rays, and was not involved in King's treatment plan or medical care. Upon review of

the x-ray, and his examination of King, Dr. Moreno concluded that the injury could be treated with pain medication, crutches, ice, and no weight bearing, and that King did not require emergency medical care. Absent extraordinary circumstances not present here, Nurse Boyd was entitled to rely upon the medical judgment of Dr. Moreno with respect to the proper course of treatment for King's injury. *See Berry v. Peterman*, 604 F. 3d 435, 443 (7th Cir. 2010) (citation omitted) (observing that "a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient"). Thus, King fails to demonstrate that Nurse Boyd acted with deliberate indifference. Accordingly, King's claim against Nurse Boyd will be DISMISSED.

King contends that Dr. Moreno knew his ankle was broken and required urgent care but instead downplayed the injury. King argues that this "caus[ed him] unnecessary pain physically and emotionally [because] on two occasions [King] was forced [to] defend [him]self in altercations while [he] waited those months for treatment for [his] broken ankle." (ECF No. 37, at 3.) As a preliminary matter, Dr. Moreno cannot be faulted because King's ankle injury and subsequent recovery impeded King in physical fights within the jail. Certainly, King has no constitutional right to engage in fights while incarcerated, and he fails to show a Fourteenth Amendment violation on this ground. Second, King fails to demonstrate that Dr. Moreno was deliberately indifferent to King's serious medical needs. The record clearly establishes that King received a great deal of treatment for his ankle including many x-rays to monitor the break, many referrals to an orthopedist, an MRI, and ultimately surgery. Here, King clearly disagrees with the timing and course of care he received, both of which fail to state a claim of deliberate indifference.

As a preliminary matter, King's ankle break is certainly a serious medical need. Nevertheless, the record makes clear that Dr. Moreno did not act with indifference to King's complaints or his injury. Dr. Moreno first treated King's ankle injury with an ace bandage, crutches, an order to not bear any weight on the ankle, ice and elevation, pain medications, and a lower bunk and tier pass. Dr. Moreno explained that the ankle break was not emergent and that emergency surgery for a fractured ankle is rare and only "required if the bone is severely dislocated, part of it had broken off or through the skin, or the ankle was unstable." (ECF No. 63–1 ¶ 7.) Dr. Moreno explained that "an ankle fracture requires non-weightbearing and compression (through an ace wrap or casting) and the fracture heals on its own through a process called remodeling. This is what I initially prescribed for [King]." (*Id.*)

When King continued to complain of pain, Dr. Moreno switched King to different types of pain medication to address his complaints. Less than three weeks after the injury, on May 6, 2021, Dr. Moreno also submitted a request for a consultation with an orthopedist. On July 16, 2021, King saw an orthopedist at VCU Foot/Ankle Clinic. Notably, at that time, the orthopedist did not find that surgery was required. Instead, he "recommended a lace-up ankle brace, [a] left ankle MRI, [an] order for no running/jumping or impact activities, ankle rehabilitation exercises, and a follow-up in four weeks," and King was provided "with ankle exercises." (*Id.* ¶ 12.) Dr. Moreno reviewed the notes from the orthopedist; noted that the orthopedist had provided King with a lace-up ankle brace; requested a left ankle MRI as recommended; continued the order for no running, jumping, or impact exercises; and continued King's pain medications. Dr. Moreno submitted a consultation request for King to return to VCU Ortho in four weeks as recommended.

On August 17, 2021, King had an MRI without contrast of his left ankle. On August 20, 2021, Dr. Moreno renewed King's pain prescriptions, and King received them when requested.

On September 30, 2021, based on VCU Ortho's recommendation, Dr. Moreno wrote a consultation request for King for surgery at VCU Ortho. On October 1, 2021, King had surgery that involved "ORIF (open reduction internal fixation)" on his left ankle. (*Id.* ¶¶ 16, 20.) Dr. Moreno and other medical staff then provided King with follow-up care for several months after his surgery. King saw the orthopedist five more times between October 15, 2021, and September 16, 2022. On September 16, 2022, the orthopedist "noted that the x-rays showed a healed fracture" and "recommended activity and weightbearing as tolerated and [for King to] return as needed." (*Id.* ¶ 25)

The record shows that Dr. Moreno did not disregard an excessive risk to King's health or safety necessary to show a constitutional violation. It appears that at most, King disagreed with the treatment plan prescribed by both the Dr. Moreno and the orthopedist. King, however, was not entitled to the medical care of his choosing. *Wright*, 766 F.2d at 849 (citations omitted); *Bowring*, 551 F.2d at 48 ("disavow[in]g any attempt [of the Court] to second-guess the propriety or adequacy of a particular course of treatment"). King fails to show that Dr. Moreno was deliberately indifferent to his ankle injury.

King's main complaint appears to be that Dr. Moreno delayed medical care for his broken ankle. The record reflects that is not true. "Where an inmate's inadequate medical care claim is predicated upon a delay in care, the inmate must also establish that the delay in the provision of medical care "resulted in substantial harm." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)); *id.* at 754 (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)) (identifying this additional requirement of the objective prong); *see Webb v. Hamidullah*, 281 F. App'x 159, 166–67 n.13 (4th Cir. 2008) (citing cases for "substantial harm" requirement). "[T]he substantial harm requirement may be satisfied

by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001) (citations omitted); *see Coppage v. Mann*, 906 F. Supp. 1025, 1037 (E.D. Va. 1995) (quoting *Monmouth Cty. Corr. Inst'l Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

First, King fails to show that Dr. Moreno intentionally denied or delayed his access to care. *Estelle*, 499 U.S. at 104–05. King saw the medical staff the day of his injury and Dr. Moreno ordered x-rays, an ankle wrap, crutches, no weight bearing, ice and elevation, pain medication, and a bottom bunk and tier pass. Dr. Moreno himself examined King three days after King's injury. Dr. Moreno and other medical staff continued to monitor King's injury with repeated x-rays and changes to his pain medications. When conservative treatments at the jail failed to address King's complaints of pain, Dr. Moreno requested a referral to an orthopedist. Initially, the orthopedist agreed to continue the conservative treatment for four weeks. After King received the MRI recommended by the orthopedist, however, it became apparent that King needed surgery.

Second, King also fails to demonstrate that any delay in scheduling surgery for his ankle caused him substantial harm. King contends that his "surgery . . . left [him] with a titanium plate in [his] ankle for the rest of my life," and he is "still suffering pain unnecessarily when it should have been addressed immediately after the injury occurred." (ECF No. 37, at 2.) Certainly, King's surgery and his resulting recovery was unpleasant and uncomfortable. King, however, fails to show that the type of surgery and recovery period required stemmed from anything other than King's initial ankle injury.[9] Stated another way, King puts forth no evidence that his delay in

---

[9] From the medical record and King's submissions, it appears that King started walking on his foot when he was supposed to be non-weight bearing. For example, on May 6, 2021, less than three weeks after his injury when he was ordered to be non-weight bearing, King reported that "it was too painful that day to bear weight and walk." (ECF No. 63–1 ¶ 9.) In his response, King noted that "he had only started walking because of a fight that occurred on June 21, 2021 . . . between me and another innate and feared that I would be continually preyed on if I continued to use crutches." (ECF No. 68, at 2–3.) Thus, an inference could be drawn that King himself

receiving surgery standing alone caused him substantial harm. And, although King contends that the surgery left him with a titanium plate and ongoing pain, he fails to offer any evidence that an earlier surgery would have yielded a different result. Accordingly, with respect to his complaints about the delay in receiving surgery, King again fails to satisfy either the objective or subjective prong for a deliberate indifference claim.[10]

In sum, King fails to demonstrate that Nurse Boyd or Dr. Moreno were deliberately indifferent to his ankle injury. Claim One lack merits and will be DISMISSED.

---

continued to put unnecessary strain on his broken ankle instead of following Dr. Moreno's orders and allowing it to heal.

[10] To the extent that King complains that after his ankle surgery he still experienced pain, he fails to demonstrate a constitutional violation. "It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating. Those recovering from even the best treatment can experience pain." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). The Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment." *Id.* So long as medical staff respond reasonably to an inmate's complaints of pain, the inmate's Eighth Amendment rights are not violated. *See Brown v. Harris*, 240 F.3d 383, 389–90 (4th Cir. 2001). Because the reasonableness of any such response usually calls for a medical judgment, "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations." *Snipes*, 95 F.3d at 592; *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) ("[T]he decision whether to provide additional treatment 'is a classic example of a matter for medical judgment.'" (quoting *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001) (internal quotation marks omitted))). This is clearly not such an extreme circumstance that judicial interference is warranted.

As described in detail above, King fails to demonstrate that Dr. Moreno acted with deliberate indifference to his complaints of ankle pain or his broken ankle. *See Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (explaining that "types of medication prescribed and referrals to specialists are generally matters of medical judgment" (citing *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992))). Rather, at most, King complains of nothing more than a disagreement with Dr. Moreno's professional medical opinion about the appropriate course of treatment and its timing, and thus, he fails to establish a cognizable constitutional claim, much less deliberate in difference. *Wright*, 766 F.2d at 849.

21

### C.  Claim Related to Grievances (Claim Two)

In Claim Two, King contends that Defendants Beasley and Sample were deliberately indifferent when they "refused to give [King] a grievance" form on April 19, 2021, through April 23, 2021, "so [King] could address my immediate medical need." (ECF No. 37, at 3.)[11] Specifically, King alleges that, "Lt. Beasley deliberately refused to give me a grievance on 4-19-21, 4-20-21, and 4-21-21," and "Lt. Sample was asked by me for a grievance on 4-22-21 and 4-23-21 . . . [and] refused to give me a grievance." (*Id.*) As a preliminary matter, the record demonstrates that Capt. Sample and Lt. Beasley did not refuse to give King grievance forms on these dates. Lt. Beasley was not even on duty on April 21, 2021. While Capt. Sample recalls King asking for informal complaint forms at some time, he indicates that he gave King the forms, but never received any completed informal complaints or grievances from King. Thus, Capt. Sample and Lt. Beasley were not deliberately indifferent to King's medical needs because the record reflects that they never refused to provide King a "grievance" form between April 18, 2021, and April 23, 2021.[12]

---

[11] King's responses seriously undermine his allegations in Claim Two. In King's response to the Motion for Summary Judgment, King states: "[A]s I stated in my particularized complaint the paper forms of informal complaints that I filled out were refused to be turned in by defendants Sgt. Beasely [sic] and Lt. Sample." (ECF No. 68, at 4.) King did not allege that these defendants failed to turn in his informal complaints in his Particularized Complaint. In fact, this new statement runs directly contrary to King's claim that these defendants refused to provide him with grievance forms. King cannot have it both ways. In another contradictory statement, King indicates that "both defendants were [his] only avenue of obtaining" the "proper forms," (ECF No. 69 ¶ 1), and once again claims that he "could never submit what [he] never got," (*id.* ¶ 3.) This statement, however, is clearly untrue. Not only do Capt. Sample and Lt. Beasley King indicate that King could receive grievance-related forms from other staff, (ECF No. 77–1 ¶ 12), but King himself undermined this allegation when he stated that he had gotten informal complaints that he filled out which Capt. Sample and Lt. Beasley refused to turn in.

[12] Both Defendants note that, at any rate, a "grievance" form would not have been the correct form to use to begin the grievance process. King would have been required to file an informal complaint that would have been submitted to Lt. Beasley for review, and to Capt. Sample for approval of the response.

Capt. Sample and Lt. Beasley both also swear that King never informed them that he believed he was receiving inadequate medical care for his ankle. Even if he had, neither Capt. Sample nor Lt. Beasley had any involvement in the provision of medical care to King and never hindered him from accessing care. King was seen in medical on April 18, 2021, the day of his injury, and again on April 21, 2021. During that time King was using crutches, had his ankle wrapped, and was receiving prescribed pain medication and ice amongst other things. At that time, it was readily apparent that King was under the care of the medical department, and Capt. Sample and Lt. Beasley could rely on those individuals charged with King's medical care to treat King appropriately. *Iko*, 535 F.3d at 242 (omission in original) ("If a prisoner is under the care of medical experts . . . , a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004))). In sum, King fails to show that Capt. Sample and Lt. Beasley were deliberately indifferent to his medical needs, and Claim Two will be DISMISSED.

## IV. CONCLUSION

King's Motion for Summary Judgment, (ECF No. 55), will be DENIED. The Motion for Summary Judgment filed by Defendants Boyd and Moreno, (ECF No. 62), will be GRANTED. The Motion for Summary Judgment filed by Defendants Beasley and Sample, (ECF No. 65), will be GRANTED. King's claims will be DISMISSED. The action will be DISMISSED.

An appropriate Order will accompany this Memorandum Opinion.

Date: 15 November 2023
Richmond, Virginia

/s/
John A. Gibney, Jr.
Senior United States District Judge